UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80794-CIV-DIMITROULEAS
MAGISTRATE JUDGE P.A. WHITE

TONY L. SCOTT,                    :

        Plaintiff,                :

v.                                :           REPORT OF
                                              MAGISTRATE JUDGE
                                  :

GEO GROUP, INC., et al.,
                                  :
        Defendants.

_____

## I   INTRODUCTION

The plaintiff, Tony L. Scott, who was previously incarcerated in the South Bay Correctional Facility ("SBCF"), filed a pro se civil rights complaint pursuant to 42 U.S.C. §1983 complaining of indifference to his serious medical needs at the institution. He named as defendants (1) SBCF Warden Earnest A. Stepp; (2) SBCF Nurse Annette Moore; (3) SBCF Health Administrator Judy Bethea; (4) SBCF Medical Director Jean R. Dauphin; and (5) the GEO Group, Inc.

At initial screening, in the Preliminary Report, the allega-tions of plaintiff Scott's complaint were summarized, as follows:

> The plaintiff alleges that he was transferred into SBCF with medical passes indicating that he needed an inmate assistant because he is legally blind. He claims that one month passed and he was not assigned an assistant, and after the security, classification and medical departments refused to help he filed a grievance with Warden Stepp. Warden Stepp ordered his designees to immediately provide the plaintiff with an inmate assistant, but no assistant was provided.  One month later, the plaintiff stepped into a hole on the recreation yard and fell onto a table and injured his shoulder. One week later the shoulder was x-rayed, and it was determined that he needed an MRI test. The plaintiff did not receive an MRI test and apparently did not receive adequate medical care for pain. The plaintiff filed a grievance with Warden Stepp, which Nurse Moore denied, telling the plaintiff to access sick call despite the fact that the plaintiff had been to sick call numerous times and received no medical care. The plaintiff filed

a second grievance with Stepp, which was sent to
medical, denied and signed by Stepp, Moore, Bethea
and Dauphin. The plaintiff has attached copies of
grievances he submitted on December 19, 2007 in
which he complains about the need for an inmate
assistant and need for medical care for pain and
January 3, 2008 complaining of pain.  The former
grievance was neither approved nor denied; the
plaintiff was told to go to sick call and speak to
Nurse Evans concerning the need for an assistant.
This grievance was signed by Bethea, Dauphin and
Stepp. The latter grievance was denied and signed
by Moore.  Liberally construed, the plaintiff
alleges that Stepp, Moore, Bethea and Dauphin were
aware of his serious medical needs but failed to
provide proper medical care.

(Report, DE#7, pp.5-6).  After initial screening of the com-
plaint (Preliminary Report DE#7), and an Order of partial dismissal
(Order DE#12), the court allowed claims of alleged medical
indifference to proceed against the named individual defendants.
GeoGroup, a corporate entity providing medical services to inmates
under contract with the Florida DOC, was dismissed, for reasons
discussed in the Preliminary Report.

**This Cause is before the Court upon a joint motion for summary
judgment by defendants Stepp, Moore, Bethea, and Dauphin (DE#32)**,
with supporting memorandum of law (DE#33), and exhibits (DE#s 33-2
to 33-9), as to which plaintiff Scott was informed of his right to
respond (see Order of Instructions, DE#36).[1] In opposition, Scott

---

[1]    Rule 56© of the Federal Rules of Civil Procedure provides that
summary judgment is proper

> [i]f the pleadings, depositions, answers to interroga-
> tories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue
> as to any material fact, and that the moving party is
> entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that
summary judgment should be entered only against

> a party who fails to make a showing sufficient to
> establish the existence of an element essential to that
> party's case, and on which that party will bear the

has filed his own Affidavit (DE#39, pp.1-3) and sworn Memorandum (DE#39, pp.4-24).

## II   DISCUSSION

> burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of Instructions (DE#36) was entered to inform the plaintiff, as a *pro se* litigant, of his right to respond to the defendants' motion for summary judgment, and to instruct him regarding requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

The defendants contend that there are no genuine issues of material fact and the uncontroverted evidence of record does not support plaintiff's §1983 civil rights claims. They argue that they are entitled to summary disposition of the complaint in their favor, because they were not deliberately indifferent to plaintiff's visual impairment and request for an Inmate Aide/Helper. Regarding the alleged failure to provide care for Scott's shoulder injury/medical needs, the defendants argue that Scott's complaint is barred from review because he failed to fully exhaust his available administrative remedies before filing suit on those claims in federal court, as required under 42 U.S.C. §1997e(a), the administrative exhaustion provision of the Prison Litigation Reform Act of 1995 ("PLRA"). Alternatively, the named defendants argue that they were not deliberately indifferent to Scott's medical needs.

### A.   <u>Plaintiff's Attempt to Raise a Claim Under the ADA</u>

Before proceeding to discussion of his claims which arise under 42 U.S.C. §1983, it is noted that the plaintiff Scott in his Response/Memorandum (DE#39) opposing the defendants' summary judgment motion (DE#32), may be attempting to raise for the first time in this case a claim under the ADA.[2] Apart from complaining in his §1983 pleading that for a period of time he was not provided an inmate assistant to help him walk about the prison (which he contends contributed to his fall, and shoulder injury), the plaintiff has alleged in his Response that he "can prove that South Bay Correctional Facility was not set up in operable working condition making it accessible to blind inmates pursuant to Florida Administrative Code, (chapter 33-210.201) and the Americans with Disabilities Act (ADA), pursuant to 42 U.S.C. §1201 et seq."

---

[2]     A plaintiff may simultaneously maintain causes of action under §1983 and the ADA arising out of the same set of facts if the §1983 claims are based on independent causes of action, i.e. claims based on violation of federally protected rights, whether constitutional or statutory, see <u>Holbrook v. City of Alpharetta, Ga.</u>, 112 F.3d 1522 (11 Cir. 1997). A §1983 claim would be duplicative of an ADA claim only if the sole alleged deprivation is the plaintiff's rights created by the Rehabilitation Act and the ADA. <u>See</u> <u>Magio v. Florida Dept. of Labor and Employment</u>, 56 F.Supp.2d 1370, 1377 (M.D.Fla. 1999), and <u>Wright v. City of Tampa</u>, 998 F.Supp. 1398, 1403-04 (M.D.Fla. 1998).

To the extent that the Plaintiff may be attempting to amend his §1983 pleading at summary judgment, by adding a new claim under the ADA, for failure to make accommodations for blind inmates at SBCF, his complaint cannot proceed against the defendants Warden Stepp, Nurse Moore, Health Administrator Bethea, and Medical Director Dauphin for several reasons. First, as a general principle, amendment of an inmate's pleadings at summary judgment is inappropriate.[3] In this case, the plaintiff submitted his pleading on a form for filing a civil rights complaint, invoking 42 U.S.C. §1983. There was no mention of the ADA by the plaintiff in the complaint and grievance forms (DE#1) which were served upon the defendants, and the defendants, relying upon the initial screening of the complaint (Preliminary Report, and Order thereon, treating the pleading as a §1983 complaint) responded to the claims, accordingly, in their Answer and motion for summary judgment. Second, even if the Court were inclined to treat the complaint liberally as including a claim arising under the ADA, for failure to timely provide plaintiff with an inmate-aide to assist him in walking about the facility, and/or to help him write grievances, the complaint could not proceed against the individual defendants. The ADA, does not provide for individual liability, Pritchard v. Southern Company Services, 102 F.3d 1118 (11 Cir. 1996); Mason v. Stallings, 82 F.3d 1007, 1009 (11 Cir. 1996); Fernandez v. Community Asphalt, Inc., 934 F.Supp. 418, 420-21 (S.D. Fla. 1996), and, therefore, defendants Stepp, Moore, Bethea and Dauphin cannot individually be held liable for damages under the ADA.  Third, the

---

[3]     The Courts recognized that a party cannot amend his or her complaint by adding new claims in filings at summary judgment. See: Gilmour v. Gates,McDonald & Co., 382 F.3d 1312 (11 Cir. 2004) (a party cannot amend her complaint to add a new claim through argument in a brief opposing summary judgment); Grayson v. O'Neill, 308 F.3d 808, 817 (7 Cir. 2002) (same); Morgan Distributing Co., Inc. v. Unidynamic Corp., 8686 F.2d 992, 995 (8 Cir. 1989) (same). Cf Coral Ridge Properties, Inc. v. Playa Del Mar Ass'n, Inc., 505 So.2d 414 (Fla. 1987) (Overton, J., dissenting) (stating that a summary judgment motion under Fla.R.Civ.P. 1.510(b) should not be permitted where motion was based on affirmative defense not plead or at issue in the pleadings; and [while agreeing that a motion for summary judgment can be made "at any time"] noting that "to allow a motion for summary judgment to contain affirmative defenses not plead is the same as allowing a plaintiff to assert new claims in a motion for summary judgment;" and further noting "I do not belief the majority is approving the latter; however, the principle is consistent with their reasoning").

plaintiff Scott is no longer confined where the alleged problems
are claimed to have existed. He is now at Gulf C.I., and therefore
any claim for injunctive relief under the ADA would be moot. <u>See</u>
<u>Spears v. Thigpen</u>, 846 F.2d 1327 (11 Cir. 1988); <u>Cotterall v. Paul</u>,
755 F.2d 777 (11 Cir. 1985)(an inmate's transfer or release from a
prison moots his claims for declaratory or injunctive relief).

### B.   <u>Plaintiff's Claims Under 42 U.S.C. §1983</u>

As noted <u>supra</u>, Plaintiff Scott alleges essentially two
claims: 1) that defendants ignored his oral and written requests,
as a legally blind inmate, for assignment of an Inmate-Aide or
Helper; and 2) after he fell on November 10, 2007, defendants
failed to provide proper diagnosis and care for his injuries.

### <u>Law Concerning §1983 Medical Claims<br>In the Prison Context</u>

Deliberate indifference to serious medical needs of prisoners
constitutes the unnecessary and wanton infliction of pain proscrib-
ed by the Eight Amendment.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104
(1976). Whether an inmate's medical need requires attention as a
matter of constitutional right depends upon its severity. <u>See</u>
<u>Estelle</u>, <u>supra</u>, at 104-06. Generally, a serious medical need is
considered "one that has been diagnosed by a physician as mandating
treatment or one that is so obvious that even a lay person would
easily recognize the necessity for a doctor's attention." <u>Farrow v.</u>
<u>West</u>, 320 F.3d 1235, 1243 (11 Cir. 2003) (quoting <u>Hill v. Dekalb</u>
<u>Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11 Cir. 1994)).

Section 1983 Eighth Amendment medical claims are not limited
to prison medical staff, but may also arise based on acts or omis-
sions of other prison personnel. On a claim that a prison guard
impeded access to medical care, the prisoner/plaintiff is required
to provide evidence that the guard intentionally interfered with
treatment once prescribed, <u>Estelle</u>, <u>supra</u>, 429 U.S. at 105;
<u>Washington v. Dugger</u>, 860 F.2d 1060, 1021 (11 Cir. 1988), or inten-
tionally delayed or denied medical care, without explanation, for
a serious medical condition that was known or obvious to the guard,

Estelle v. Gamble, supra, 429 U.S. at 104; Brown v. Hughes, 894 F.2d 1533, 1538 (11 Cir. 1990). Even where a prisoner has sustained a serious injury, however, a defendant corrections officer or medical staff member (e.g. a nurse) may be entitled to summary judgment where the plaintiff offers no evidence that the defendant was aware of his injury, or that the defendant was subjectively aware of a serious risk of harm. Farrow v. West, supra, 320 F.3d at 1248 (Nurse, alleged in the complaint to have ordered her staff not to provide medical care, was entitled to summary judgment where the prisoner plaintiff failed to submit evidence that the nurse was herself subjectively aware of a serious risk of harm to the plaintiff); Brown v. Hughes, supra, 894 F.2d at 1539 (with respect to claim relating to delay in treatment of a serious injury [a broken foot], 2 nurses, a corrections officer, and the Sheriff were entitled to summary judgment where the plaintiff's affidavits and other evidence failed to show that they were aware of his injury on the day that it occurred).

Title 42 U.S.C., Section 1983, requires an affirmative causal connection between an official's acts and an alleged constitutional deprivation. Harris v. Ostrout, 65 F.3d 912, 917 (11 Cir. 1995); Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11 Cir. 1995). Negligence is not enough,[4] and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment does not rise to the level of a constitutional deprivation.[5] Thus, it is well settled that a showing of mere

_____

[4]     It is well settled that a showing of mere negligence, neglect, or even medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. Estelle, supra, 429 U.S. at 104-06; Daniels v. Williams, 474 U.S. 327 (1986); Farrow, supra, 320 F.3d at 1243; Brown v. Hughes, 894 F.2d 1533, 1537-38 (11 Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11 Cir. 1988).

[5]     The Courts have long recognized that a difference of opinion between an inmate and prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. Estelle, supra, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim). See: Ledoux v. Davies, 961 F.2d 1536 (10 Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medi-

negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. <u>Estelle</u>, <u>supra</u>; <u>Adams v. Poag</u>, 61 F.3d 1538 (11 Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, (11 Cir.), <u>cert. denied</u>, 475 U.S. 1096 (1986). To prevail on such a claim, the detainee must establish: 1) an "objectively serious deprivation," i.e. a serious medical need accompanied by a substantial risk of serious harm if unattended; 2) a response by public officials beyond negligence, i.e., one that is so inadequate as to constitute and "unnecessary and wanton infliction of pain;" and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, and that they actually did draw that inference. <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11 Cir. 2002). <u>Cf</u> <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (to establish that a prison official acted with deliberate indifference to a serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence").

As the Eleventh Circuit has noted, proof that the defendant should have perceived a risk, but did not, is insufficient. <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1364 (11 Cir. 1999)(citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 838 (1994); <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1491 (11 Cir. 1996)(the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting <u>Farmer</u>, <u>supra</u>, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew

cation other than that prescribed by treating physician was insufficient to establish constitutional violation); <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10 Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), <u>cert. denied</u>, 450 U.S. 1041 (1981); <u>Smart v. Villar</u>, 547 F.2d 112, 114 (10 Cir. 1976) (same); <u>Burns v. Head Jailor of LaSalle County Jail</u>, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

of "an excessive risk to inmate health or safety" and disregarded that risk." <u>Campbell</u>, <u>supra</u>, at 1364 (citing <u>Farmer</u>, at 837).

### 1.   Plaintiff Scott's §1983 Claim
### Relating to Assignment of an Inmate Assistant

It is assumed, for purposes of the complaint and the defendants' motion for summary judgment, that plaintiff Scott's disability, his blindness, qualified as a serious medical need. <u>See</u> <u>Estelle v. Gamble</u>, <u>supra</u>, 429 U.S. at 104-06; <u>Farrow v. West</u>, <u>supra</u>, 320 F.3d at 1243. It is undisputed that Scott was issued a walking cane. The gravamen of this claim by Scott is that there existed a policy by which a blind inmate could request and be formally assigned an inmate assistant, upon whom the visually impaired prisoner could consistently rely to assist him with various daily activities. In this case, the daily activity in question was inmate Scott's need to walk about the institution (SBCF) without injuring himself. It is beyond dispute that prison and jail officials are obligated to take all reasonable precautions to protect inmates from known dangers. <u>See</u> <u>Davidson v. Cannon</u>, 474 U.S. 344 (1986); <u>Smith v. Wade</u>, 461 U.S. 30 (1983); <u>Hopkins v. Britton</u>, 742 F.2d 1308 (11 Cir. 1984); <u>Harmon v. Berry</u>, 728 F.2d 1407 (11 Cir. 1984); <u>Saunders v. Chatham County Board of Commissioners</u>, 728 F.2d 1367 (11 Cir. 1984); <u>Williams v. Bennett</u>, 689 F.2d 1370 (11 Cir. 1982). For the plaintiff to prevail on his claim, he must show that there was a causal connection between his injury and the acts/omissions of a defendant, and he must show that the defendant was deliberately indifferent to a risk of harm to his health or safety, having been made aware of relevant facts and having ignored that risk even after having drawn a conclusion that a significant risk of harm existed if he/she, the defendant, did not act to prevent it.

Here, despite the fact that Tony Scott, a blind inmate, had a walking cane, the alleged risk of harm was that he might fall and hurt himself if he did not have a permanently assigned Inmate Assistant to help him walk about the institution.

Although he also places blame on other named defendants [Nurse

9

Moore, Health Administrator Bethea, and Medical Director Dauphin],
plaintiff Scott primarily focuses blame on Warden Stepp for failure
to provide him with a permanent Inmate Helper, and for the fall and
injury on the prison recreation yard on November 10, 2007, which he
[plaintiff] claims would not have occurred if a permanent Helper
had been assigned and had been holding his arm on that day.

The evidence of record, including defendants' exhibits, and
the plaintiff's Affidavit, show the following. Prior to his stay at
SBCF during which his fall and injury took place on November 10,
2007, the plaintiff Scott had previously been confined at SBCF and
was there until August 27, 2007. He was transferred to another ins-
titution, and returned to SBCF on September 24, 2007. (See Scott
Affid., DE#39; Stepp Affid., DE#33-2). Prior to that transfer,
Scott, as a new inmate, had first arrived at SBCF on or about June
4, 2007, and then underwent an Orientation Program that covered
facility operations and rules. That program, among other things,
covered the process for an impaired inmate to request inmate
assistance as a result of any medical issue the newly arrived
prisoner might have. The usual procedure for the impaired inmate to
request an inmate assistant is to write a request to his
classification officer; and the classification officer then
forwards that request to a specific person, the infection control
nurse at SBCF, who alone is responsible for approving or denying
the request. At the time of the events alleged in this case, the
SBCF Infection Control Nurse was Allison Evans. (See Stepp Affid;
Moore Affid., DE#33-4). There existed an alternative means for an
impaired inmate to request assistance, which was to write a request
directly to the Medical Department. (Stepp Affidavit).

After his arrival at SBCF in June 2007, Scott followed
procedure and submitted a request via Classification. On 7/3/07 he
was assigned Andrew Glover as his Impaired Helper. (DE#33-9, p.2).
On August 27, 2007, for medical reasons, Scott was transferred from
SBCF to another institution, via South Florida Reception Center.
[Scott states that the transfer was to the RMC, or Reception and
Medical Center, at Lake Butler]. Scott was returned to SBCF on

10

September 24, 2007. It appears that upon his transfers to SFRC/RMC,
the assignment of inmate Glover as Scott's regular helper expired;
and that upon his return to SFRC Scott had to make a renewed
request for assignment of an Inmate Helper. It is acknowledged by
Warden Stepp that on October 1, 2007, inmate Scott made a new
written request for an inmate assistant. (Stepp Affid.). That
request, however, was not made through Scott's classification
officer, in accordance with the ususal procedure, as was his prior
request that had been granted on 7/3/07. Nor was it made through
the proscribed alternative procedure, which was to write a request
directly to the medical department. Rather, the 10/1/07 request for
an inmate helper was made in a request directed to the Warden's
Office. (See DE#1, p.11; DE#33-5, p.2). In the 10/1 Request, Scott
asserted that he had verbally approached ["talked to"] unspecified
Medical, Classification, and Security personnel, requesting a
helper, and having not gotten assistance, he was resorting to the
Request to the Warden's Office. (Id.).   This 10/1/07 Request,
marked for submission to the Warden's Office, either fell through
the cracks, or processing of it was delayed because it was mixed
among volumes of other miscellaneous inmate requests awaiting
review. Although it presumably was submitted on 10/1/07 and was
awaiting review along with other inmate requests, both plaintiff's
and defendants' copies of the request indicate that it was not
marked "received" until 11-19-07, and then was answered on 11/20/07
a 10:20 a.m. (As an explanation for the delayed "receipt" and
answer to plaintiff's 10/1/07 request, the defendant Warden
explains in his Affidavit (DE#33-2) that "[SBCF] receives hundreds
of inmate requests per week regarding various non-medical
reasons"). By the time that Scott's 10/1/07 request was marked
"received" and was answered, the accident on the prison recreation
yard, which caused Scott's injury on 11/10/07 had already occurred.

        In his Affidavit, plaintiff Scott relates the following about
his efforts between September 24 and November 10, 2007, to get an
assigned inmate helper.

        Scott states that upon his September 24, 2007 return to SBCF,

11

he was told by a housing supervisor that he would be placed in E-
Dorm. (Affidavit, DE#39). He states that he verbally informed Nurse
Evans of his need for an inmate assistant, and Evans stated that
she would get him an assistant from E-Dorm. Scott states, however,
that by September 28 no E-dorm assistant had been assigned, but
during those four days other inmates would approach, ask where he
was going, and would escort him. Hence, he was given the nickname
"hitch-hiker." Plaintiff Scott states in his affidavit that he
personally spoke to Warden Stepp on September 28, 2007, three days
before he wrote his 10/1/07 Inmate Request to the Warden's Office,
and states that he also spoke with Stepp in person on several more
occasions before his 11/10/07 accident. Scott asserts that each
time he was being escorted by an inmate, and that the conversations
with Stepp occurred when he encountered him near a mailbox. On
9/28/07 it was with help of an unnamed inmate that Scott
encountered and spoke with the Warden. He indicates that during
that conversation he told Stepp he was an E-Dorm inmate without an
inmate assistant, that Stepp asked who his former helper had been,
and he [Scott] said that it had been Andrew Glover. Stepp asked
where Glover had been housed, and Scott said H-Dorm. (Scott
indicates that on an undisclosed date Nurse Evans told him that
Glover, his previous helper, had been transferred from SBCF). Scott
states that throughout October he had no permanently assigned
helper, but that he was transferred to H-Dorm where "random inmates
would volunteer to help me if they were not busy." He states that
September 28 was the last conversation he had with Warden Stepp
before he filed his October 1, 2007 written request to the Warden's
Office, seeking an inmate helper. Scott asserts in his Affidavit,
however, that between October 1 and November 10, 2007, an inmate
named Kevin Neal from A-Dorm "would volunteer to come to H-Dorm
(with permission of the building Sgt.) to escort me around." He
states that before his November 10, 2007 injury, "Neal and myself
would walk the breezeway looking for Warden Stepp." Scott states
that while doing this "I was able to be scorated [sic] to him
standing in front of the mailbox in front of B-Dorm," and that
"during each one of those encounters I repeatedly asked him for an
inmate assistant to be assigned to me, and each time he would tell

12

me that he was working on it." (Scott Affid.).

Scott's affidavit indicates the following regarding his November 10 fall, and events that followed.

Scott states that "on November 10, 2007, when I stepped into a hole on the recreation yard and fell into a table I still had not received an inmate assistant." (It is unclear from either the plaintiff's or defendants' exhibits whether Scott had his blind walking cane with him while he was on the recreation yard. There is no indication in exhibits of record whether or not a "volunteer" inmate was with Scott at the time, but it is implied in his complaint and affidavit that no one was helping him when he stepped into the hole and fell). Scott states that on the evening of November 10, 2007, after his accident, an inmate named Rodney Parramore took it upon himself to escort him to the medical department. (Plaintiff's medical record for 11/10/07, DE#33-6 at pp.13-14, indicates that the Medical Department saw him at 6:00 p.m.).

In his Affidavit, Scott further indicates that on November 13, inmate Neal escorted him back from a medical call out. (The medical record confirms that on 11/13/07 Scott was seen between 11:00 a.m. and noon by Dr. Tennenbaum, DE#33-6, p.12). Neal told Scott that Warden Stepp was by the mailbox, and Scott asked if he could speak with him. Stepp asked Scott why his arm was in a sling, and he said he had stepped in a hole and fell into a table on the recreation yard. Scott states that he also told the Warden that he still had not been assigned an inmate assistant. According to Scott's Affidavit, six days later, on November 19, 2007, he and Parramore were walking the breezeway together, and encountered Warden Stepp. Scott told the Warden that he was still lacked an assigned inmate helper, and that Parramore was willing to take the position. Scott states that at that time, Nurse Evans came out of B-Dorm, and the Warden pulled her aside and "told her to take care of this today." Scott further states that on November 20, 2007, Parramore was assigned as his helper (Scott Affid.). (The record contains a copy of an 11/20/07 Request for Parramore to be Scott's helper, bearing Evans'

signature, but the form neither indicates that the request was denied, or approved. Use See DE#39-9, p.3). The record shows that Parramore was later trained for the position.[6]

## Warden Stepp

Although plaintiff Scott states in his complaint and affidavit that he spoke with Warden Stepp on several occasions, both before his August 27, 2007 transfer from SBCF, and again between September 24 and November 10, 2007 (after his 9/24/07 return to SBCF), careful review of the record reveals that the plaintiff has failed to demonstrate, based on the evidence of record, that Warden Stepp was deliberately indifferent to his medical need for an inmate helper.

It is undisputed that inmate Scott and Warden Stepp had conversations at SBCF. In his affidavit, Warden Stepp states "I personally interacted with Tony Scott both before his month long leave from August through September, 2007 and after his return." He also states that "[on] several occasions, Tony Scott would see me on the compound breezeway and come to speak with me."(Stepp Affid., DE#33-2). While plaintiff Scott has asserted in his Affidavit that at each encounter with Warden Stepp he told the Warden that he had not yet received a permanently assigned inmate helper (see Scott Affid., and discussion, supra), Stepp in his Affidavit has stated: "While I do not specifically remember if Tony Scott ever asked me personally for an  inmate assistant, every inmate is advised that if they need an inmate assistant to follow the procedure taught at orientation to notify classification, who, in turn, will forward the request to the infection control nurse." Warden Stepp also states in his Affidavit that "An inmate can also notify the medical department should they need an inmate assistant."

Significantly, Warden Stepp states in his Affidavit that each

---

[6]      The record also contains a request approved by Nurse Evans on 12/5/07, for inmate James Thompson to be Scott's helper (DE#33-9, p.4), and documents dated 2/8/08 relating to training of inmate Thompson for that position (DE#33-9, pp.5-12).

and every time he encountered inmate Scott, Scott was never alone, and was always being helped by another inmate. (Stepp Affid., "On every interaction, Tony Scott had an inmate assisting him"). This assertion by Stepp is confirmed by inmate Scott through statements/admissions in his own Affidavit.

It is undisputed that Warden Stepp, who is not medically trained, did not himself have authority to grant or deny an inmate's request for an inmate assistant due to a medical issue. That decision lay solely in the hands of the Infection Control Nurse, Allison Evans [who is not a designated defendant]. (See Stepp Affid., DE#33-2); see also Moore Affid., DE#33-4)

Plaintiff Scott clearly was fully aware of the procedure established to request an Inmate Helper, having himself gone through Orientation following his June 2007 arrival at SBCF, and having used that procedure to secure the assignment of inmate Andrew Glover by July 2007. Despite this knowledge, after his subsequent transfer from and return to SBCF later in 2007, Scott did not follow the established procedure to request a new Inmate Helper.

According to Scott's October 1, 2007 Inmate Request directed to the Warden's Office (DE#1, p.11; DE#33-5, p.2) he resorted to verbal requests ("I have talk to Medical, Classification, and Security and haven't receive any assistance"). Although it is dated 10/1/07, it is undisputed that the request languished for 39 days among other inmate requests, and was not processed until 11/19/07, some 9 days after plaintiff's fall and injury. The 11/20/07 Response, which was not signed by Warden Stepp, but by another unidentified staff member, read "Spoke with Mr. Scott 11-20-07 @ 10:15 AM wants to stay in Dorm H2-106L and is filling out Paper Work with Mrs. Evans for his helper Today!"

In sum, the evidence indicates that Warden Stepp never saw the 10/1/07 Inmate Request prior to the 11/10/07 Fall. It is also apparent from the record that the 10/1/07 request, which was sent by plaintiff Scott to the wrong department (it should have been

15

directed to classification, or to medical) was Scott's only post
9/24/07 written request for an inmate helper. The record further
indicates that although Warden Stepp saw inmate Scott on several
occasions between September 24 and November 10, 2007, even if Scott
did verbally mention to Stepp that he had not yet been assigned a
permanent inmate helper, Scott had a blind cane, and on every
single encounter with Warden Stepp he always had an inmate escort.

Despite plaintiff Scott's expectation/argument that, after he
spoke with him, the Warden should have intervened and had an inmate
assistant helper assigned [although the Warden was not medically
trained, and under established procedure was not himself authorized
to grant or deny a request for a helper on medical grounds], for a
defendant such as the Warden to be culpable, even proof that he
should have perceived a risk to the inmate plaintiff, but did not,
is not enough. Farmer, supra, 511 U.S. at 838; Campbell, supra, 169
F.3d at 1364. Rather, there must have been a "sufficiently culpable
state of mind." Cottrell, supra, 85 F.3d at 1491. Here, for Warden
Stepp to be found deliberately indifferent and liable, there must
be a showing that he not only knew of facts indicating that a
significant risk of harm existed, but based on such facts he must
have drawn the inference that that risk exited, and he then must
have disregarded he risk by failing to act to prevent it. Campbell,
supra, 169 F.3d at 1364; Taylor, supra, 221 F.3 at 1258; Brown,
supra, 387 F.3d at 1351.

Under the circumstances of this case, and absent any other
evidence that the Warden should have been on notice that Scott was
at a particular risk of harm prior to his fall, it cannot be said
that Stepp was deliberately indifferent to Scott's medical need for
an inmate helper. There is nothing to suggest that the Warden was
aware that holes existed on the recreation yard, or that inmate
Scott might step into one and fall and injure himself. Where the
inmate plaintiff Scott had a blind walking cane, and the defendant
Warden always encountered him with a prisoner assisting/escorting
him, it is far too attenuated to say that he should have foreseen
occurrence of the 11/10/07 accident or similar incident, so as to

16

assign culpability based on plaintiff's argument that if he had had a permanently assigned Helper he would not have tripped in a hole on the recreation yard, and would not have been injured.

## The Other Defendants, Moore, Bethea, and Dauphin

Review of the record establishes that, on the claim of failure to assign inmate Scott a permanent inmate Helper upon his September 24, 2007 return to SBCF, there is no basis on to hold Nurse Moore, Health Administrator Bethea, or Medical Director Dauphin liable, due to absence of a showing of deliberate indifference by them.

The record shows the following. Nurse Moore's sole involvement in plaintiff Scott's case was reviewing his medical record and then drafting and signing a January 4, 2008 Response to an Inmate Request/Informal grievance dated and submitted by Scott on January 2, 2007. (See DE#1, p.12; DE#33-5, p.5). Scott's 1/2/07 Request, which was directed to the Warden's Office, was referred to the Medical Department for Response. Therein, he complained of stepping in the hole on the rec yard, falling, and injuring his shoulder when he struck a table. He stated that he had been X-rayed, and was told on December 13, 2007 that a request for an MRI would be processed. He complained that the MRI had not yet been taken, and that he was in great pain, and stated that he was "going to sick call again concerning this matter." In this Informal Grievance there was no mention whatsoever of failure to provide an inmate helper. Nurse Moore states that her role was to review Scott's medical records, which showed that Dr. Cohen had x-rayed his left shoulder, and that Dr. Cohen's report showed no acute fractures, dislocations, or other bony abnormalities of the shoulder. As Moore also states in her Affidavit, she instructed inmate Scott in her 1/4/08 Response to access sick call because he was complaining of shoulder pain. Moore further states in her Affidavit that Scott at no time personally asked her to provide him with an inmate assistant, and states that at no time did she have authority to grant or deny an inmate's request for an inmate assistant as that authority rested solely with the Infection Control Nurse, who at

17

the time of the events alleged was Allison Evans [no longer
employed at SBCF at the time that Moore's 2/29/09 Affidavit was
executed]. (Moore Affid., DE#33-4).

From the record, and plaintiff's filings, it is apparent that
Health Administrator Bethea's involvement in Scott's case was that
she signed a 1/4/08 Grievance Response, which was also initialed by
Dr. Dauphin, and signed by Warden Stepp, denying a December 19,
2007 grievance. (See DE#1, p.13; DE#33-5, p.3). That grievance by
Scott was directed to the Warden's Office, but was apparently
referred to the medical department for response. In that grievance
Scott mentioned, parenthetically, that after complaining to medical
and the Warden that he needed an aide to assist him, he had stepped
in a hole, and was injured. Scott also asserted in the 12/19/07
grievance that he was in pain. The grievance was denied, with
instructions to the plaintiff that if he had any issues with
discomfort he was to go to sick call. He was instructed that "any
issues relating to impaired helpers should be referred to Mrs.
Evans, RN." Although the plaintiff argues in his own Affidavit
that the defendant Bethea did not oppose his complaint by filing
her own affidavit, and reasons therefore that all allegations
against her should be deemed to be admitted, there is no specific
fact allegation or evidence of record that the plaintiff had any
pre-accident discussion with Bethea personally. Moreover, despite
the fact that no affidavit by her was submitted, Bethea did join
the other defendants in their motion for summary judgment, and
addressed the allegations against her. The mere facts that Bethea,
as a medical staff member, may have been aware that Scott is blind,
and that she with two others (Dr. Dauphin, and Warden Stepp) denied
Scott's 12/19/07 grievance which was filed more than a month after
his fall, does not establish facts that could be construed as
showing deliberate indifference on her part regarding the alleged
failure to assign the plaintiff a regular inmate helper after his
September 24, 2007 return to SBCF. It was more than one month after
Scott's fall that he wrote the 12/19/07 grievance, and Bethea
signed the 1/4/08 Response denying it for reasons stated above.

Concerning assignment of an inmate Helper, the sole evidence of record regarding Dr. Dauphin's involvement is placement of his initials on the 1/4/08 Grievance Response that Bethea and the Warden also signed. There is no suggestion or specific allegation of record that Scott spoke to Dauphin and requested an inmate helper at any time before his 11/10/07 fall. As to Dauphin, on this claim, there is no evidence suggesting deliberate indifference.

## 2. Other Medical Claims

The gravamen of plaintiff Scott's other §1983 medical claim consists of allegations that, after sustaining a shoulder injury in the 11/10/07 fall on the recreation yard, he did not receive proper post-injury medical care. More specifically, he has alleged that after he was x-rayed, the taking of an MRI was delayed; and he also complained through the grievance process that although he had been seen by medical personnel, he continued to be in pain.

The defendants argue, first, that Scott's claim of post-injury medical indifference, i.e., inadequate medical care, is barred under 42 U.S.C. §1997e(a) because he failed to properly and fully exhaust his available administrative remedies before he filed suit in federal Court.

Alternatively, they argue that the medical care provided was within the applicable standard of care, and that on their part there was no deliberate indifference to inmate Scott's serious medical needs.

Careful review of the record reveals that defendants' argument about lack of exhaustion on the claim of inadequate medical care, is correct, at least with respect to Scott's claim regarding failure to diagnose, where taking of his MRI was allegedly delayed.

### The PLRA Exhaustion Requirement, and the Law

As enacted on April 26, 1996, the PLRA significantly altered a prisoner's right to bring civil actions in forma pauperis, and in pertinent part places new restrictions on a prisoner's ability to

19

seek federal redress concerning the conditions of his confinement. Title 42 U.S.C. §1997e, entitled Suits by Prisoners, provides, in pertinent part, as follows:

>    (a) Applicability of administrative remedies
>
>    No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The kind of claim raised by the plaintiff in this case comes under the purview of the statute.[7]

In general, the rules for Florida inmate grievances, as published in the Florida Administrative Code, provide first for an inmate to file an Informal Grievance, see F.A.C. §33-103.005(1), and thereafter, if dissatisfied with the response, to file a formal grievance at the institution, see: F.A.C. §33-103.006, et seq. Thereafter, in the event that the inmate feels the grievance was not satisfactorily resolved during the formal grievance procedure, he may file a Request for Administrative Remedy or Appeal to the Office of the Secretary, see F.A.C. §33-103.007, et seq. See Chandler v. Crosby, 379 F.3d 1278, 1288 (11 Cir. 2004).

In the case of medical concerns, the Code section relating to the handling of formal grievances (§33-103.006) provides that the inmate may bypass use of an initial informal grievance, and begin his medical complaint with a formal grievance at the institution

---

[7]    The types of claims which fall within the purview of the statute are not limited to physical conditions encountered within the inmate's cell such as heating or cooling, limited space, or squalor.  The Courts have held that a wide spectrum of claims constitute "prison conditions" for purposes of §1997e. This includes medical claims. See: Harper v. Jenkin, 179 F.3d 1311 (11 Cir. 1999) (prisoner medical claims); Booth v. Churner, et al., 206 F.3d 289 (3 Cir. 2000) (case involving excessive force by guards; in which the Court held that for purposes of the PLRA, conditions of confinement-- in addition to complaints about things such as overcrowding, inadequate medical facilities, and inadequate law library facilities -- also include denial of food, denial of heating, and denial of medical attention, because all such actions "affect the lives of prisoners similarly," and "make their lives worse").

(see §33-103.006(3)(e). This is known as a formal "Grievance of a Medical Nature" (see §33-103.008). If the inmate is dissatisfied with the result of the medical formal grievance (e.g., if it is denied), the Code provides that (like a non-medical formal grievance), the inmate is authorized to appeal to the Office of the Secretary. (see §33-103.007, supra, "Appeals to the Secretary").

The Code provisions establish time frames for the filing of informal grievances, formal grievances, and grievance appeals to the Office of Secretary, see F.A.C. §§33-103.011(1);[8] and specific-ally provides an avenue for inmates to request extensions of time, which may be granted on an inmate's showing that meeting the filing deadline was not feasible, and that he made a good faith effort to file in a timely manner. See F.A.C. §§33-103.011(2).

The Courts have made clear that §1997e(a), as amended, now requires a prisoner to have exhausted those administrative processes which are available to him before bringing suit on a claim in federal court. Alexander v. Hawk, 159 F.3d 1321 (11 Cir. 1998); Booth v. Churner, 532 U.S. 731, 736-41 (2001) (holding that "one 'exhausts' processes, not forms of relief..."); Miller v. Tanner, 196 F.3d 1190, 1193 (11 Cir. 1999) (incarcerated state prisoner must first comply with the grievance procedures estab-lished by the state department of corrections before filing a federal lawsuit under §1983); Harper v. Jenkin, 179 F.3d 1311, 1312 (11 Cir. 1999) (where a grievance was not timely filed, an appellant must have sought leave to file an out-of-time grievance, and if he has not done so before bringing suit, then his administrative remedies will be considered unexhausted, since to

---

[8]     Formal grievances must be received no later than 15 days from: (1) the date on which an underlying formal grievance was responded to; or (2) the date on which the incident or action being grieved occurred if an informal grievance was not filed pursuant to circumstances specified in F.A.C. §33-103.006(3), which allows bypass of the informal grievance process in cases of emergency.  Section 33-103.011(1)(c) provides that an Appeal to the DOC Central office in Tallahassee, seeking review of a ruling on a formal grievance at the institutional level, must be received within 15 days from the date of the Response to the formal grievance.

find otherwise would allow inmates to simply ignore the PLRA's exhaustion requirement and still gain access to federal court).

Thus, the Courts have held that satisfaction of the PLRA exhaustion requirement serves as a threshold issue, since the statutory mandate requires an inmate/prisoner must have fully exhausted the administrative remedies/processes which are available to him or her, <u>before</u> bringing suit on a claim in federal court, regardless of the form of relief that the administrative process makes available. <u>See</u> <u>Booth</u>, <u>supra</u> 532 U.S. at 736-41; <u>Higginbottom v. Carter</u>, 223 F.3d 1259 (11th Cir. 2000); <u>Miller</u>, <u>supra</u>, 196 F.3d at 1193; <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11 Cir. 1999); <u>Harper</u>, <u>supra</u>, 179 F.3d at 1312; <u>Alexander</u>, <u>supra</u>, 159 F.3d at 1325-26.

The Eleventh Circuit and Supreme Court have outlined policy concerns underlying the exhaustion requirement, which are served when inmates are not permitted to simply ignore the PLRA's exhaustion requirement, and yet gain access to federal court.[9]

Even when an inmate argues that it would be futile for him to attempt to exhaust the administrative processes which are available as part of an established inmate grievance procedure, that does not excuse the inmate/plaintiff's failure to comply with the statutory

---

[9]    The Eleventh Circuit has described seven policy reasons for favoring an exhaustion requirement: (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures. <u>Alexander v. Hawk</u>, <u>supra</u>, 159 F.3d at 1327; <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1156 (11 Cir. 2005). The Supreme Court, in 2002, observed that the current exhaustion requirement under §1997e(a) was designed to reduce the quantity and improve the quality of prisoner suits, and affords corrections officials an opportunity to address complaints internally before allowing the initiation of a federal case; and in some instances, corrective action taken in response to a grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. <u>Porter v. Nussle</u>, 534 U.S. 516, 516-17 (2002). The Court further noted that in other instances, the internal review might filter out some frivolous claims; and for cases ultimately brought to court, an administrative record clarifying the controversy's contours could facilitate adjudication. <u>Id</u>. at 517.

requirement that he do so.[10]

## **Plaintiff's Administrative Remedies**
## **Regarding the Alleged Delay of Diagnosis (MRI)**
## **Were Not Fully and Properly Exhausted**

In this case, careful examination of the record reveals that the defendants correctly argue in their motion (DE#33) that

---

[10]    The term "available," as used in Section 1997e(a), does not mean that inmates must only exhaust their administrative remedies if the type of relief they seek is "available" within the administrative apparatus; instead, the term means that a prisoner must exhaust all administrative remedies that are available before filing suit, regardless of their adequacy. Alexander v. Hawk, supra at 1325-26; Harris v. Garner, 190 F.3d 1279, 1286 (11 Cir. 1999). This means that an inmate who is seeking money damages as relief from defendants in a lawsuit must exhaust all of his administrative remedies before filing suit, even if money damages are not available as relief through the jail or prison grievance procedure. Alexander; supra; Moore v. Smith, 18 F.Supp.2d 1360, 1364 (N.D.Ga. 1998). The Supreme Court has explained that "available" refers to the "possibility of some relief for the action complained of." Booth v. Churner, 532 U.S. 731, 738 (2001); Hall v. Richardson, 144 Fed.Appx. 835, 836, n.2 (11 Cir. 2005) (citing Booth, for the Court's definition of "available" in the context of §1997e(a)).

The Eleventh Circuit has held that "the judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA," Alexander v. Hawk, supra, 159 F.3d at 1325-26; Harris v. Garner, 190 F.3d 1279, 1286 (11 Cir. 1999). Where exhaustion is now a precondition to suit "the courts cannot simply waive those requirements where they determine that they are futile or inadequate," since "such an interpretation would impose an enormous loophole in the PLRA which Congress clearly did not intend," and because "[m]andatory exhaustion is not satisfied by a judicial conclusion that the requirement need not apply," Alexander, supra, at 1326 [citing, Weinberger v. Salfi, 422 U.S. 749, 766 (1975) (holding that where exhaustion is a statutorily specified jurisdictional prerequisite, "the requirement...may not be dispensed with merely by a judicial conclusion of futility")]. Cf. Qawi v. Stegall, et al., 211 F.3d 1270 [table case, published on Westlaw], No. 98-1402, 2000 WL 571919, at *1-2 (6 Cir. (Mich) May 3, 2000) (Circuit Court affirming district Court's dismissal of the complaint for lack of exhaustion, and noting that the dismissal was appropriate even though by time of the appeal the plaintiff's administrative remedies might have become time-barred) (citing Hartsfield v. Vidor, 199 F.3d 305, 309 (6 Cir. 1999); and Wright v. Morris, 111 F.3d 414, 417, n.3 (6 Cir. 1997)). Even an inmate's transfer from an institution does not remove the requirement that he/she pursue and exhaust administrative remedies concerning events which occurred at the institution prior to the inmate/prisoner's transfer. See Hall v. Richardson, 144 Fed.Appx. 835, 836, n.2 (11 Cir. 2005) (in case where plaintiff argued on appeal that he could not exhaust his administrative remedies because he was transferred from the institution where the alleged violations occurred, that he could no longer pursue exhausting his remedies through the administrative process, and that the transfer should be deemed to have removed the exhaustion requirements, the Appellate Court, upon affirming the district Court's dismissal pursuant to §1997e(a), rejected the plaintiff's arguments, and in doing so noted that incidents he complained of had occurred in December 2000 and December 2001, but he was not transferred until February 28, 2002, and therefore he had not exhausted his administrative remedies when he had the opportunity to do so).

plaintiff Scott failed to fully exhaust his available administrative remedies regarding his medical claims, before bringing this §1983 action in federal court.

Scott's only use of the inmate grievance procedure to seek administrative relief in regard to the delay in conducting an MRI examination [about which he complains in his §1983 complaint], was the aforementioned Inmate Request/Informal Grievance, dated and directed by him to the Warden's Office on 1/2/08, which was responded to and denied by Nurse Moore on 1/4/08. (This is the Request/Grievance in which Scott complained that an MRI had not yet been performed, after he had had X-rays and was told that an MRI would be scheduled). The form on which Nurse Moore's Response denying the informal grievance was written, explicitly stated, and instructed plaintiff Scott, as follows: "Based on the above information, your grievance is Denied...If your informal grievance is denied you have the right to submit a formal grievance in accordance with Chapter 33-10033.006, F.A.C."

Examination of the plaintiff's and defendants' exhibits (Attachments to DE#1; and Exhibits at DE#33-5) consisting of copies of Inmate Requests/Administrative Grievances filed by plaintiff Scott, show that just as the defendants assert in their summary judgment motion, the inmate/plaintiff Scott never filed a Formal Grievance containing the subject matter of his 1/2/08 informal grievance (i.e., that he needed an MRI that he had been told would be taken). Nor did plaintiff Scott file an Appeal to Tallahassee concerning the alleged failure to provide care/diagnosis (the alleged delay of the MRI).

The plaintiff has inferred in his Response to the defendants' motion for summary judgment (DE# 39, p.7) that he should not be held responsible for any failure to exhaust his available administrative remedies, because he is blind, and did not have a assistance of a certified law clerk, and lacked the aid of auxiliary Braille materials so that he could properly read and respond to the applicable grievance procedures. While he makes this

assertion, Scott does not state, and cannot credibly claim, that he was ignorant of the required steps for use of the established three-tier inmate grievance procedure. This is because the record shows that at various times Scott made use of all three adminis- trative processes (an informal grievance at the institutional level, a formal grievance at the institutional level, and appeal to the DOC Office in Tallahassee). The record shows that he filed an Informal grievance (the 1/2/08 Informal Grievance, at DE#1, p.12; DE#33-5, p.5); a Formal Grievance to the Warden's Office (see e.g. the 12/19/07 Formal Grievance, responded to and denied by Bethea, Dauphin, and Stepp on 1/4/08, at DE#1, p.13; DE#33-5, p.3); and Appeals to Tallahassee (see e.g. a 1/18/08 Appeal from denial of the 12/19/07 Formal Grievance, at DE#1 p.15; DE#33-5, p.6; or his renewed 2/7/08 Appeal at DE#1, p.18; DE#33-5, p.8, which was filed by Scott after his 1/18/08 appeal was returned without action because he had failed to append to it an attachment/continuation pages).

Not only does the record show that Scott knew about and used all the various steps of which the administrative process was comprised, but his administrative filings themselves clearly demonstrate Scott's understanding and ability, albeit with inmate assistance, to successfully navigate around procedural hurdles that are part of the administrative process. Specifically, Scott asserted and successfully used in his 12/19/07 Formal Grievance, the exception providing for an extension of time, where the inmate shows that meeting a filing deadline was not feasible, and that he made a good faith effort to file in a timely manner. (In the 12/19/07 Formal Grievance, DE#1, p.13; DE#33-5, p.3, Scott specifically stated at the end of his statement: "I acknowledge this grievance is untimely but due to my disability of my sight and finding someone to file a grievance without fear of retaliation I have been unable to file in a timely fashion"). The re-filing of his Appeal to Tallahassee on 2/7/08, after dismissal without action of his 1/18/08 Appeal for procedural reasons, further demonstrates that Scott was able to deal with complexities that he encountered when making use of the administrative processes comprising the

Florida inmate grievance procedure.

The fact that the plaintiff Scott was able to file a 12/19/07 Formal Grievance, and was able on 1/18/08 and 2/7/08 to have drafted and then personally sign grievance appeals, makes abundantly clear that he had access to administrative grievance forms [there is no allegation that he ever requested and was denied forms by staff], and makes clear that he also had access to inmates who were willing to assist him to draft administrative/grievance documents.

In sum, there is nothing to explain why, upon Nurse Moore's denial of his Informal Grievance which complained that the taking of his MRI was delayed, that Scott could not have filed a Formal Grievance seeking further review of that decision. (After Moore's 1/4/08 denial of the 1/2/08 Informal Grievance concerning the MRI exam, Scott's follow-up Formal Grievance would have been due to be filed within 15 days by 1/19/08 – – and this would have been just 1 day after he actually signed and filed the aforementioned 1/18/08 Appeal which was concerned with a separate subject, failure to assign a permanent inmate Helper). Even if Scott could not timely find an inmate to help file a Formal Grievance by 1/18/08 to seek review of the 1/4/08 denial of his 1/2/08 Informal Grievance, he could simply have invoked the provision allowing an extension of time for excusable neglect, as he had previously done in his December 2007 Formal Grievance.

Under the circumstances of this case, the plaintiff Scott should therefore not be heard to claim that the inmate grievance procedure was rendered unavailable to him; and it is apparent that on the claim that defendants failed to provide post-injury medical care, his complaint should be barred, for failure to exhaust his administrative remedies, as is required under §1997e(a), and as the defendants assert as a threshold defense in their motion for summary judgment.

### The Claim that Plaintiff had Pain After His Accident

An argument can be made that the plaintiff did fully exhaust a claim that after his fall and injury he experienced continued pain.[11]  That allegation (construing the *pro se* non-movant plaintiff's complaint, Response, and exhibits liberally), could be interpreted to allege that the plaintiff was not being properly treated for pain associated with his injury.

Under appropriate circumstances, extreme pain, sufficient to require pain medication, especially prescription drugs, may itself, constitute a serious medical need. See Bruette v. Tidquist, No. 08-cv-489-bbc, 2008 WL 4460384 at *3 (W.D.Wisc. Sept.30, 2008); Cooper v. Casey, 97 F.3d 914, 916-17 (7 Cir. 1996).

The defendants in this case argue that they were not deliberately indifferent to the plaintiff's serious medical needs. With references to Warden Stepp's, Dr. Dauphin's, and Nurse Moore's Affidavits (Exhibits A, B and C, at DE#s 33-2, 33-3 and 33-4), and

---

[11]     In his 12/18/07 Formal Grievance, which in part asserted that he had requested but was not provided a regularly assigned inmate assistant, the plaintiff also stated "Since the accident happened I have constantly been suffering with pain, in which could result in a permanet [sic] problem." (DE#35-3, p.3).  In the 1/4/08 Response he was told that if he had pain he should go to sick call; and issues about impaired Helpers should be referred to Mrs. Evans, R.N." (Id.). In both his first Appeal (dated 1/18/08) and his Second Appeal dated 2/7/08 (DE#s 35-5 at pp. 6 and 8, respectively) he complained that without assistance of an aide, which he had requested, he had stepped in the hole and injured himself, and he further complained that he had grieved to the institution for failing to provide him with assistance before the incident happened "and for putting me in harm(s) way that I'm now suffering for" (DE#33-5 at p.6, and 33-5 at pp.8-9). When the Response to the Second appeal was made (see Response, DE#33-5 p.11), the DOC construed the appeal as complaining about security and not medical concerns (stating that the institution "was contacted," that "the holes were filled in the recreation yard," and stating "Please be advised since this is not a medical issue, in the future, you will need to address your concerns to security"). The Response, having said that, however, parenthetically stated: Should you experience problems, sick call is available so that you may present your concerns to your health care staff." (Id.). Because the second Appeal was not rejected procedurally, for having mixed two separate issues in a single administrative grievance/appeal (one related to security, and the other related to pain), and since the Appeal Response addressed plaintiff's right to access sick call if he experienced problems, it appears that the grievance appeal can be liberally construed as having addressed plaintiff's medical-related claim (from the 12/19/07 Formal Grievance that he was suffering "constant pain," which he restated on appeal as having been "put in harms way that I'm now suffering for"). A liberal construction of the 12/19/07 Formal Grievance and 2/7/08 Appeal is that they grieved that plaintiff's pain was not controlled, and it appears therefore that that claim about pain was administratively exhausted.

plaintiff's medical records (Exhibits E-1 to E-3 at DE#s 33-6, 33-7, and 33-8), The defendants set out in their summary judgment motion (DE#33 at pp. 4-10) a detailed account of the plaintiff's medical diagnoses and tests and treatments given, when he presented with medical complaints between 11/10/07 (the date of his injury), and 11/10/2008 (the date that he was transferred away from SBCF).

The record reveals that the defendant Warden, not trained in medicine, had no involvement in providing medical care to the plaintiff. His signing of the 1/4/08 Response, denying Scott's 12/19/07 grievance which in part complained that he had suffered constant pain since his accident, does not render the Warden liable, where the plaintiff was instructed in the response that if he had issues of pain or discomfort, he should refer himself to sick call. Similarly, where the record only indicates that defendant Bethea, the SBCF Health Administrator, participated in the same 1/4/08 denial of the Formal Grievance, which instructed Scott to access sick call for his pain, cannot be said to render Bethea deliberately indifferent to plaintiff's medical need (i.e. treatment of pain, presumably with medication).

Similarly, where as discussed above the defendant Nurse Moore's only involvement was an administrative review of plaintiff's medical record and denial 1/4/08 of plaintiff's 1/2/08 Informal Grievance, with instructions for him to access sick call, that also does not suffice to render Moore deliberately indifferent to Scott's complaint that he was in pain.

Likewise, although Dr. Jean Dauphin was the Medical Director, who supervised all doctors and nurses employed at SBCF, he cannot be held vicariously liable for acts or omissions of subordinates of which he was unaware or in which he was not involved.

The medical record, as reflected in Defendants' Exhibits E-1 to E-3, and as summarized in Daphin's Affidavit, reflects that plaintiff's medical complaints and symptoms were not ignored, and were diagnosed. (In brief, Scott was examined by a Nurse on the day

of his injury, and was given an ice bag. He was seen and evaluated
3 days later by Dr. Tennenbaum, on 11/13, who ordered an X-ray.
Scott was found on the floor of his cell on 11/14/07 after
apparently fainting, unrelated to his shoulder. He was diagnosed by
Dr. Dauphin with vertigo and syncope. The x-ray ordered by Dr.
Tennenbaum on 11/13 was taken on 11/15, and Dr. Cohen, the
Radiologist, read it and found no acute fractures, dislocations, or
other bony abnormalities in the shoulder. There was a benign lesion
at the end of the humerus. On 11/20 Scott was seen by Dr.
Tennenbaum, who informed him that the x-ray results were negative,
and prescribed Tylenol. On 12/11/07, Scott again saw Tennenbaum,
for pain, and he wrote a consultation Request for an MRI. The
appointment for the MRI, outside the prison, was made for January
15, 2008. Scott wrote his 12/19/07 Formal Grievance which was
denied on 1/4/08 by Bethea and Dauphin, and Scott was told to go to
medical if he had pain. On January 15, 2008, he was sent for the
MRI to Dr. Suarin Shah, whose diagnosis was tendinosis with a
partial thickness tearing of tendons, but no full-thickness rotator
cuff tear.  On 1/31/08, Scott returned to medical complaining of
shoulder and neck pain, ans was seen by Dr. Kankam. Daupin, as a
result of that examination, wrote a request for an Orthopedic
referral, as Scott was suffering from tingling and numbness in his
left arm and hand. Dauphin noted on the referral request that the
MRI had shown tendinosis as well as impingement syndrome. The
Orthopedist gave an appointment date of 2/29/08. On that date,
Scott saw the Orthopedist, Dr. Slutsky, to whom he complained of
pain at night, and inability to raise his hand above his head.
Slutsky's impression was that there was paresthesia with a probable
rotator cuff tear, and he wanted to see the MRI before making a
plan of treatment.  On 3/17/08, Scott was seen by a Nurse and Dr.
Dauphin for shoulder pain; and he was again seen at medical on
3/24/08 and was referred to Dr. Slutsky for a follow-up visit. On
3/27/08 he was seen by Nurse Dixon, and was seen on 3/28/08 by
Dauphin, whom Scott told that day he was without shoulder pain. On
4/16/08 he saw Dr. Slutsky, but Scott did not have his MRI report
with him. Slutsky wanted to see the MRI, but his examination
suggested paresthesias (tingling or pins and needles sensations)

with possible radiculopathy, and a possible rotator cuff tear developing into chronic adhesive capusilitis. On 5/9/08, Scott again saw Dr. Slutsky, who reviewed the MRI. He gave Scott injections of Lidocaine and Depo-Medrol in his shoulder for relief of pain. On July 9, 2008, Scott was seen by LPN Morris,, complaining of pain, but he refused medication. On 7/29/08, Dauphine wrote a DOC consultation request for an Orthopedist, and an August 15, 2008 appointment was made. Meanwhile, on 8/4/08, Scott was seen at Medical by Nurse Pedraza, and was told that the appointment had been made. On 8/5/08 Scott went to medical requesting another inmate to help him at night time, and the request was approved the next day. Scott was seen at Medical on 8/15 and 8/18, and on the latter date Dauphin wrote a Request for Scott to see a Neurologist, and the appointment was made for 9/11/08; and Dauphin also noted that Scott needed a steroid injection. On 9/2/08 Scott was seen at medical by Nurse Trimble, who gave him Tylenol. On 10/7/08, Scott was seen by Dr. Shah for a cervical spine MRI, upon a request by SBCF staff. Dr. Shah said there was straightening of the normal spinal curvature, possibly due to muscle spasm, and mild disc bulges and other disc abnormalities. Surgery was at no time medically recommended. (Dauphin Affid.).

From this physician's summary of the medical record, and extensive course of evaluation and diagnosis of plaintiff's conditions, it is apparent that his medical needs were not ignored, either by Dr. Dauphin, or others who were not designated as defendants in the case. In addition, specifically, with regard to pain control, Scott's Chronological Record of Health Care reflects that he was provided an Ice Pack upon initial evaluation at the medical department on 11/10/07, the day of his accident. The physician's Orders, and plaintiff's medication charts attached to defendants' summary judgment motion, at Exhibit E-3, reflect that during the days, weeks, and months after his injury, the plaintiff (who was allergic to Motrin) was provided, among other things, Acetaminophen, Robaxin (a drug for skeletal or muscular pain or injury), Tylenol ES 500 mg. (Extra Strength), and Vicodin (a pain

medication containing Hydrocodone and Acetaminophen), for pain.

In sum, while the plaintiff did file grievances stating that he was experiencing pain even weeks after his injury, the record does not suggest that he was ever denied access to medical care, that his medical symptoms went un-examined and/or un-diagnosed, or that he was denied pain medication. He has not alleged facts that would suggest that his allegations/complaints about pain amount to anything more than a difference of opinion between inmate plaintiff, and prison medical staff, which without more, does not rise to the level of a constitutional tort, and it is apparent that the named defendants were not deliberately indifferent to the plaintiff's serious medical needs.

### III    CONCLUSION

For the above stated reasons, it is therefore recommended that: 1) as to all claims and defendants, the Defendants' joint motion for summary judgment (DE# 33) be granted; and 2) this case be closed.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: July 13<u>th,</u>  2009.

UNITED STATES MAGISTRATE JUDGE

```
cc:   Tony L. Scott, Pro Se
      DC# 204581
      Jefferson Correctional Institution
      1050 Big Joe Road
      Monticello, FL 32344
      (Mailed from Chambers)


      Tony L. Scott, Pro Se
      DC# 204581
      Reception Medical Center
      P.O. Box 628
      Lake Butler, FL 32054
      (Last Address of Record)


      Brett M. Waronicki, Esquire
      WEIDERHOLD & MOSES, P.A.
      560 Village Blvd., Suite 240
      West Palm Beach, FL 33409
```